UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DANNY R. RICHARDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-00225-SEB-KMB |
| | ) | |
| THE GEO GROUP, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Danny Richards alleges in this civil action that the defendants were deliberately indifferent to his Clostridioides difficile (C. diff) infection and hygiene needs created by his anal sleeve and that they left him in unsanitary conditions. In addition, he is proceeding on a related claim of excessive force against defendant Ndaiye and a Rehabilitation Act claim against the Indiana Department of Correction (IDOC).

The defendants have filed three separate motions for summary judgment and Mr. Richards has responded to all three. Neither the IDOC nor the correctional defendants have replied and the time to do so has passed. For the reasons below, the IDOC's motion for summary judgment is denied. The medical defendants and The GEO Group (GEO) defendants' motions are granted as to GEO and the Eighth Amendment conditions of confinement claims against defendants Hord, Seye, and Ndaiye, and denied in all other respects.

**I.
Standard of Review**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no

genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all

2

reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

Richards has been incarcerated by the IDOC since 1995. Richards Deposition, dkt. 121-1 at 4 (7).[1] He was first diagnosed with C. diff in 2008. Dkt. 154. C. diff is a contagious bacterium that causes diarrhea, stomach pain, nausea, and inflammation of the colon.[2] It can be life-threatening. After symptoms of C. diff subside, the infected person can still spread the bacterium to others and may experience relapses of their C. diff symptoms.[3]

As a result of his C. diff, Mr. Richards developed toxic ulcerative colitis and had three operations between 2009-2010 to remove his colon, rectum, and a large part of his large intestines. Dkt. 121-1 at 4 (8-9).

After his surgeries, Mr. Richards was housed at Wabash Valley Correctional Facility (Wabash Valley) until he was transferred to New Castle Correctional Facility (New Castle) on March 13, 2012. *Id*. at 5 (10). New Castle is an IDOC facility managed by a private company, GEO. Mr. Richards was later transferred back to Wabash Valley because New Castle could not provide him with a one-man cell which he needed because he had C. diff. *Id*.

On December 2, 2019, Mr. Richards was housed in a single-man cell at Wabash Valley. *Id*. at 17 (60). He began having symptoms of active C. diff so he notified a nurse passing out medication and handed her a healthcare request form. Richards Affidavit, dkt. 153-1 at ¶ 2. She instructed the correctional officers on duty to keep Mr. Richards quarantined in his cell until a stool sample was taken. Dkt. 121-1 at 17 (60).

---

[1] The deposition transcript was filed with four pages printed on each .pdf page. The Court cites to the pdf page, followed by the transcript page in parentheses.
[2] Centers for Disease Control, available online at www.cdc.gov/cdiff/.
[3] Centers for Disease Control, available online at www.cdc.gov/cdiff/after.

3

Two days later, Mr. Richards was transferred back to New Castle. Before he left Wabash Valley, a nurse told him that New Castle's medical department had been instructed to quarantine him. *Id*. A letter written by J. French, a GEO administrator at New Castle, on January 3, 2020, confirms that when Wabash Valley requested a transfer of Mr. Richards, a single-cell environment was recommended, and New Castle's medical department knew he was in medical quarantine before his transfer. Dkt. 153-3 ("Upon review, the request for PC transfer submitted by Wabash recommended a "single-cell" environment. . . . Our medical department reports that Mr. Richards was in medical quarantine prior to transfer."). He remained separated from other inmates during the trip to New Castle and while being processed into the new facility. Dkt. 121-1 at 5 (11-13).

Upon arrival at New Castle, Mr. Richards requested to see the medical department. *Id*. at 5 (13). An officer told him that the healthcare services administrator, defendant Hord, was standing nearby, so he told her that he needed to be put on quarantine because he had C. diff and he believed it was active. *Id*. at 5-6 (13-14). She told him that his medical condition is confidential so he shouldn't tell anyone. *Id*. at 6 (14). An unknown officer then took Mr. Richards to his housing unit. Mr. Richards told that officer about the situation, but the officer still placed him in a cell with another inmate. *Id*. at 6 (14-15). Mr. Richards explained the situation to his new cellmate and told him that he would do everything he could to get out of there. *Id*.

Mr. Richards pressed the emergency call button in the cell several times over 45 minutes to ask for help, but he was always told to submit a healthcare request form. He knew it would take several days before a healthcare request form would be received and processed before he would be seen by a medical provider. *Id*. at 7 (18-19).

Mr. Richards felt his situation was urgent for several reasons. He had already refused to eat lunch because he knew he would have to use the bathroom immediately after eating, and he

4

still used the bathroom twice in the 45 minutes he was in the cell. *Id*. at 6 (15-16); 7 (21). He had been assaulted by a previous cellmate because of his C. diff and feared it could happen again. *Id*. at 7 (19). And he did not want to pass on a dangerous and life-altering condition to someone else. *Id*. at 18 (64).

Eventually, Officer Ogike and Sergeants Seye and Ndaiye came to the cell. *Id*. at 7 (20). Mr. Richards explained to the officers that his colon had been removed, that he had C. diff which he believed was active, and that he was supposed to be quarantined. *Id*. at 9 (26). Sergeant Seye responded that he could not do anything about it. *Id*. at 7-8 (21-22). Mr. Richards replied that there was a medical exam room in the unit and that he had seen a nurse in the exam room when he was brought to the unit. *Id*. Sergeant Seye said he was not going to accommodate Mr. Richards' single-cell request and that Mr. Richards and his cellmate should work out any problems they had between themselves. *Id*.

Mr. Richards picked up a razor blade and threatened to harm himself in an effort to be removed from the cell. *Id*. at 9 (26-28). Sergeant Seye readied his can of O/C spray and said he was ready for a workout and that Mr. Richards should go ahead and do what he needs to do. *Id*. Mr. Richards cut himself twice on his left forearm. *Id*. at 9 (29). Sergeant Seye told him to cuff up and he complied. *Id*.

The officers took Mr. Richards to the medical exam room. When the nurse learned that Mr. Richards had C. diff she expressed concern that she had not been notified that there was an inmate on the unit with C. diff. *Id*. at 10 (30). Mr. Richards was then taken to the infirmary where a doctor used approximately 13 stitches and 7-8 butterfly stitches to close his cuts. *Id*. at 10 (31). His wounds were then wrapped in cotton gauze. *Id*.

Medical Health Professional (MPH) Williams then met with Mr. Richards. He explained the situation to her, and she determined that he should be placed on suicide watch. *Id*. at 10 (32). He was placed in a segregated cell with different inmates assigned shifts to watch him. *Id*.

The following day, December 5, 2019, Mr. Richards was moved to another cell. *Id*. at 10 (33). He was not allowed clothing in the cell. Sergeant Ndaiye also ripped the bandage off of his stitches before he was placed in the new cell. *Id*. at 10-11 (33-35). When Sergeant Ndaiye ripped off the bandage, he pulled out several of Mr. Richards' stitches, reopening Mr. Richards' wounds and causing them to bleed again. Dkt. 153-1 at ¶ 36. Sergeant Ndaiye did not allow Mr. Richards to clean his wounds. Dkt. 121-1 at 12 (38). Sergeant Ndaiye testified that he does not remember removing Mr. Richards' bandage and that it is the responsibility of medical staff to remove bandages before inmates are placed on suicide watch. Ndaiye Affidavit, dkt. 121-5 at 2.

Mr. Richards was placed in a cell that was covered in human feces. Dkt. 121-1 at 11 (35). He asked Officer Reed if he (Mr. Richards) could clean it up and Officer Reed said no. He asked for toilet paper and soap and Officer Reed said no. *Id*. He continued to ask, but Officer Reed said that Sergeant Ndaiye said it was GEO policy to not allow inmates on suicide watch to have toilet paper or soap. *Id*. at 12 (38). Mr. Richards acknowledged at his deposition that he is not aware of any GEO policy preventing inmates on suicide watch from having soap or toilet paper and that the individual defendants probably just said there was a policy. *Id*. at 15 (51-52). He was also denied any eating utensils and had to eat with his hands. *Id*. at 20 (71).

With active C. diff and no access to soap, toilet paper, or even a spork, Mr. Richards could not eat or take his medications because his hands were never clean. *Id*. at 12 (39-40). Officer Mr. Moore came to pass out lunches. Mr. Richards asked him for soap to wash his hands so he could eat because he was having to wash with cold water and his hand after having bowel

movements. Officer Mr. Moore just walked away. *Id*. at 12-13 (41-42). Over the next several days, Mr. Richards repeatedly asked Officers Reed, Betters, Gard, Mr. Moore, and Ms. Moore for soap and toilet paper, but he was always denied. *Id*. at 13 (42-43).

Officers Mr. Moore, Betters, and Gard worked the night shift. They would turn the lights in Mr. Richards' cell on and off. At one point, Officers Betters spoke to Mr. Richards over the intercom and told him to "stick [his] finger up [his] anus." *Id*. at 13-14 (45-46). Mr. Richards was forced to lived with feces covering parts of his body for days which caused irritation to his skin and worsened his symptoms of COPD. *Id*. at 15 (50).

On the evening of December 6, 2019, Officers Betters and Mr. Moore came to Mr. Richards' cell and told him not to use the intercom to ask for soap and water because he was not allowed to have any. Dkt. 153-1 at ¶ 65. Later that evening Mr. Richards had blood in his stool. He pressed the intercom button and told the officers that he needed to see medical because there was blood in his stool. *Id*. at ¶ 66. Officer Mr. Moore came to Mr. Richards' cell again and told him again to not use the intercom unless it was a medical emergency. *Id*. at ¶ 67.

On December 9, 2019, Mr. Williams removed Mr. Richards from suicide watch. Non-defendant Officer Martin took Mr. Richards to shower and gave him clean clothes. Mr. Richard was then able to eat. Dkt. 121-1 at 14 (47-48). Medical records indicate that he tested positive for C. diff when the sutures were removed from his arm on December 19, 2019. Dkt. 121-6 at 2-3. Mr. Richards is now housed in a single-man cell at Indiana State Prison. Dkt. 121-1 at 13 (43).

## III.
## Discussion

The defendants' three motions for summary judgment involve five categories of claims: 1) an Eighth Amendment excessive force claim against Sgt. Ndaiye; 2) Eighth Amendment deliberate indifference and conditions of confinement claims against the individual defendants;

3) State law negligence claims against the individual defendants; 4) an Eighth Amendment policy claim against GEO; and 5) a Rehabilitation Act claim against IDOC. The Court will address each in turn.

### A. Excessive Force Claim Against Defendant Ndaiye

The Eighth Amendment protects prisoners from excessive physical force amounting to cruel and unusual punishment. *Wilkins v. Gaddy*, 559 U.S. 34 (2010). The "core judicial inquiry" in excessive force claims is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 37. While the extent of the plaintiff's injuries may "provide some indication of the amount of force applied," courts must focus their analysis on the force applied rather than seriousness of the injuries when deciding an excessive force claim. *Id.* at 38.

Sgt. Ndaiye has no memory of his interaction with Mr. Richards, but he testified at his deposition that it is the job of medical staff to remove bandages before an inmate is placed in a suicide watch cell. Ndaiye Affidavit, dkt. 121-5 at ¶8; Ndaiye Deposition Excerpts, dkt. 161-1 at 29-30. Mr. Richards attests in his affidavit that Sgt. Ndaiye removed the cotton ace bandage that had been applied over his stitches. Richards Affidavit, dkt. 153-1 at ¶ 36. In doing so, Sgt. Ndaiye ripped out several of Mr. Richards' stitches, reopening his wound and causing it to bleed. *Id*.

Sgt. Ndaiye argues that Mr. Richards' injuries were de minimis and therefore cannot support an excessive force claim. Dkt. 120 at 6. However, the Court considers Mr. Richards' injuries as only an indicator of the amount of force Sgt. Ndaiye applied when removing the bandage. *Wilkins*, 559 U.S. at 38. A reasonable juror could conclude that Sgt. Ndaiye's use of force—which ripped out some stitches and caused Mr. Richards' wound to reopen and bleed—was not a good-faith effort to maintain or restore discipline but was done maliciously or sadistically to

8

cause Mr. Richards harm. Therefore, Sgt. Ndaiye is not entitled to summary judgment on this claim.

### B. Eighth Amendment Deliberate Indifference Claims against the Individual Defendants

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'"

#### a. Serious Medical Condition

The medical and GEO defendants dispute that Mr. Richards had a serious medical condition when he arrived at New Castle:

- "[H]e simply had no history of or diagnosis of C. Diff, as that diagnosis did not occur until December 10, 2019." GEO Defendants' Brief in Support of Summary Judgment, dkt. 120 at 8.

- "There is no evidence that Mr. Richards had been diagnosed with C-Diff or was having symptoms consistent with C-Diff upon his transfer to the New Castle Correctional Facility." Medical Defendants' Brief in Support of Summary Judgment, dkt. 113 at 16.

These statements are belied by Mr. Richards history of C. diff starting in 2008, including surgeries requiring the removal of his colon and other parts of his digestive tract due to the resulting colitis, and Mr. Richards testimony that he had been experiencing symptoms of active C. diff for several days before his arrival at New Castle. The Court views the record in the light most

9

favorable to Mr. Richards, as it must when deciding the defendants' motions for summary judgment, and finds that his long-term battle with C. diff and the resulting removal of his colon and reliance on an anal sleeve for toileting constitute a serious medical condition.

### b. Deliberate Indifference

Deliberate indifference requires more than negligence or even objective recklessness. *Johnson*, 5 F.4th at 824. Plaintiff "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Id*. "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted). The Seventh Circuit has "held that a jury can infer deliberate indifference when a treatment decision is 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Id.* (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). But where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently. *Id.* at 241-42.

### 1. Individual GEO Defendants

There is sufficient evidence in the record for a reasonable juror to conclude that defendants Seye and Ndaiye acted with deliberate indifference when they failed to take any action in response to Mr. Richards' requests to be seen by the nurse in the unit because he was experiencing symptoms of a recurring and contagious infection. Similarly, a reasonable juror could conclude that Officers Mr. Moore and Mr. Betters acted with deliberate indifference when they ignored his request for medical assistance after he reported finding blood in his stool. Certainly, non-medical staff are

10

entitled to rely on the medical judgment of medical staff. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019) ("[T]he division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment."). But there is no evidence in the record that any of these officers conveyed Mr. Richards' symptoms to medical staff to determine whether he required urgent care.

There is also sufficient evidence in the record for a reasonable juror to conclude that defendants Betters and Mr. Moore, and the remaining correctional officers, acted with deliberate indifference when they refused to allow Mr. Richards soap, toilet paper, or cleaning supplies which left him unable to eat, drink water from his sink, or take his medication without risking re-ingesting the C. diff bacteria being shed in his feces.

For these reasons, the individual GEO defendants are not entitled to summary judgment on Mr. Richards' Eighth Amendment deliberate indifference claims.

### 2. Medical Defendants

There is sufficient evidence in the record for a reasonable juror to conclude that HSA Hord acted with deliberate indifference when Mr. Richards informed her that he had just arrived from Wabash Valley and had active C. diff and her only response was to tell him not to tell others about his condition. HSA Hord argues that inmates with active C. diff should be quarantined to prevent the infection from spreading to others, rather than for the health of the already-infected inmate, and that she is not normally responsible for reviewing the medical records of arriving inmates or assigning them to a cell. Nevertheless, she was confronted with an inmate who informed her that he had active C. diff, a contagious and potentially life-threatening infection. Had she taken him for testing, or simply reviewed his medical records, she would have learned of his extensive history with the infection.

MHP Williams placed Mr. Richards on suicide watch after he made two deep cuts in his forearm. Although he reported to her that he took this action in order to avoid exposing his cellmate to C. diff, it was well within the range of professional medical judgment to place him under observation for several days. And as a mental health professional, Ms. Williams was not qualified to treat Mr. Richards' C. diff.

However, there is evidence in the record from which a reasonable juror could conclude that she acted with deliberate indifference to his need for basic hygiene supplies to be able to eat, take his medication, and treat his C. diff infection. MHP Williams knew Mr. Richards was being denied access to basic hygiene products despite her orders that he have them. He attested in his affidavit that he told her he was being denied soap and toilet paper on December 5, 2023. Dkt. 153-1 at ¶ 33. Her notes indicate that Mr. Richards told her he had defecated on his hands while trying to wipe without toilet paper, that he was denied hand sanitizer when he asked for it, and that as a result he was refusing to eat meals. Williams Deposition, dkt. 153-5 at 22. She testified at her deposition that she would not have asked correctional staff why he wasn't given hand sanitizer because she needed to encourage him to "advocate for [himself]." *Id*. MHP Williams also testified at her deposition that she did not think that having feces on one's hands would keep a person from eating with their hands.[4] *Id*. at 49. MHP Williams may not have had the authority to force officers to provide Mr. Richards with soap and toilet paper. But a reasonable juror could conclude that her lack of response when he made clear to her that he was reduced to choosing between not eating or eating with hands contaminated with his own feces amounts to deliberate indifference.

---

[4] Recall that Mr. Richards was being served meals without utensils while on suicide watch so his only means of eating was with his hands.

For these reasons, neither HSA Hord nor MHP Williams are entitled to summary judgment on this claim.

### C. Eighth Amendment Conditions of Confinement Claims against the Individual Defendants

"A prisoner challenging conditions of confinement must first show that the conditions were sufficiently serious as an objective matter, meaning that they den[ied] the inmate civilized measure of life's necessities, creating an excessive risk to the inmate's health and safety." *Thomas v. Blackard*, 2 F.4th 716, 719-20 (7th Cir. 2021) (quotations omitted). Second, "the inmate must prove that prison officials acted with deliberate indifference—that they knew of and disregarded this excessive risk of harm to the inmate." *Id*.

After being moved to a suicide cell, Mr. Richards experienced conditions that a reasonable juror could find denied him a civilized measure of life's necessities that created an excessive risk to his health. But it is clear from the record that defendants Seye, Ndaiye, and Hord had no interaction with Mr. Richards after he was moved to a suicide cell. Thus, they are entitled to summary judgment on this claim.

The remaining individual correctional defendants and MHP Williams all denied Mr. Richards' requests for soap, toilet paper, and showers, despite being told that he suffered from C. diff and had toileting issues.[5] A reasonable juror could conclude from this record that these defendants were deliberately indifferent to the risk created by Mr. Richards' lack of soap and toilet

---

[5] Despite Mr. Richards' deposition testimony that these individual GEO defendants repeatedly denied his requests for soap and toilet paper, they state in their brief in support of their motion for summary judgment that it is not disputed that Mr. Richards was provided with toilet paper, soap, and water upon request. Dkt. 120 at 3. This clear dispute of material fact should have precluded these defendants from moving for summary judgment on Mr. Richards' conditions of confinement claim. Their pursuit of summary judgment when there are clear disputes of fact wastes scarce judicial resources and the resources of pro bono counsel recruited to represent Mr. Richards. At the least, these defendants should have withdrawn that portion of their motion after Mr. Richards responded. But the GEO defendants did not reply at all.

paper. Therefore, defendants Reed, Mr. Moore, Ms. Moore, Betters, Gard, and Williams are not entitled to summary judgment on Mr. Richards' Eighth Amendment conditions of confinement claims.

### D. State Law Negligence Claims Against the Individual Defendants

Mr. Richards is pursuing state-law negligence claims against the individual defendants for the same conduct as discussed in sections B and C. To evaluate these claims, the Court must apply Indiana law by doing its "best to predict how the Indiana Supreme Court would decide" the issues. *Webber v. Butner*, 923 F.3d 479, 482 (7th Cir. 2019). Under Indiana law, to prove negligence, a plaintiff must establish by a preponderance of the evidence that the defendant: (1) owed a duty to the plaintiff; (2) breached that duty by failing to meet the appropriate standard of care; and (3) the plaintiff suffered injury as the proximate result of the defendant's failure to perform its duty. *See Parrott v. United States,* 536 F.3d 629, 635 (7th Cir. 2008); *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016).

Prison officials have a duty to provide humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Reasonable jurors could conclude that the individual defendants breached this duty by ignoring Mr. Richards' requests for basic hygiene items and medical care. They could also conclude that Mr. Richards was injured by the breaches because he could not safely eat or take his medication, and he continued to suffer the painful and humiliating effects of C. diff while his treatment was delayed. For these reasons, the individual defendants are not entitled to summary judgment on Mr. Richards' negligence claims.

### E. Eighth Amendment Policy Claim Against GEO

Mr. Richards claims that GEO violated his Eighth Amendment rights through a policy or widespread practice of denying inmates on suicide watch access to basic hygiene items like soap

and toilet paper. His claim is based on statements made by several individual defendants that GEO did not allow inmates on suicide watch to have these items. While GEO "cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of *respondeat superior* for constitutional violations committed by [its] employees," it can be held liable for "unconstitutional … policies or customs." *Simpson v. Brown County*, 860 F.3d 1001, 1005-6 (7th Cir. 2017) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 690-91 (1978)).

Mr. Richards acknowledged in his deposition that he has no knowledge of a GEO policy prohibiting inmates on suicide watch from having soap and toilet paper and that such a policy probably does not exist. Dkt. 121-1 at 15 (51-52). And while GEO could also be liable for a widespread unconstitutional practice even if it is not a formal policy, Mr. Richards has presented no evidence that other inmates were injured by a widespread practice of denying basic hygiene products to inmates on suicide watch. *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 617 (7th Cir. 2022) ("To establish deliberate indifference to the purportedly unconstitutional effects of a widespread practice, Stockton must point to other inmates injured by that practice."). Therefore, GEO is entitled to summary judgment.

### F. Rehabilitation Act Claim Against IDOC

To succeed on his claim under Section 504 of the Rehabilitation Act, Mr. Richards must show that "(1) he is a qualified person (2) with a disability, and (3) the [defendant] denied him access to a program or activity because of his disability." *Jaros v. Illinois Dep't. of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012). Courts have interpreted "program or activity" broadly in the prison context to include things such as accessing meals and showers. *Id.* (collecting cases).

The IDOC argues that Mr. Richards has failed to identify what accommodations he has been denied and how they relate to his disability. Dkt. 117 at 5-6. In response, Mr. Richards argues

15

that he was denied a single-man cell, which his condition required, and that he was denied the cell because of his disability. In other words, officials at New Castle did not want an inmate with C. diff so they denied him a single-man cell, knowing that he would have to be transferred to another prison where he could be accommodated. This view is supported by GEO's assistant facility administrator's letter to the IDOC Central Office in early January 2020 which stated:

> He has an "anal sleeve" (versus a rectum) that requires removal of the waste collecting container, emptying and reinsertion, reportedly an involved process. . . . We could manage Richards at NCN M unit, but it would certainly require taking a bed off-line in order to accommodate the practical need for him to be singled celled.

Dkt. 153-1. New Castle had the ability to accommodate what it acknowledged was a practical need created by Mr. Richards' disability but failed to do so. Instead, prison officials worked to have him transferred to a different facility. In addition, the IDOC acknowledges that Mr. Richards' C. diff caused him to have his colon and a large part of his intestines removed and that he was denied soap and toilet paper while he was on suicide watch. Dkt. 117 at 1-2.

Mr. Richards' active C. diff and the replacement of his colon and rectum with an anal sleeve interfere with major life activities such as using the restroom and interacting with others. The record in the light most favorable to Mr. Richards as the non-movant is that he was denied a single-man cell when he arrived and was then consistently denied access to toilet paper, soap, and a shower for several days while on suicide watch and suffering the effects of active C. diff. A reasonable juror could conclude that the IDOC denied Mr. Richards' accommodation for his disability. See *United States v. Georgia*, 546 U.S. 151, 157 (2006) (observing that the refusal to accommodate disability-related needs for "hygiene" could constitute the denial of a service).

## IV.
## Conclusion

In summary, the IDOC's motion for summary judgment, dkt. [116], is **denied**. The medical defendants' motion for summary judgment, dkt. [112], is **granted as to** the Eighth Amendment conditions of confinement claim against defendant Hord and **denied** in all other respects. The GEO defendants' motion for summary judgment, dkt. [119], is **granted as to** GEO and the Eighth Amendment conditions of confinement claims against defendants Seye and Ndaiye and **denied** in all other respects. No partial summary judgment shall enter at this time.

The **clerk is directed** to remove GEO as a defendant on the docket.

The following claims are still proceeding in this action:

- Eighth Amendment deliberate indifference claims against Sgt. Seye, Sgt. Ndaiye, Ms. Moore, Mr. Moore, Mr. Betters, Ms. Gard, Mr. Reed, Mrs. Hord, and Mrs. Williams;

- Eighth Amendment conditions of confinement claims against Ms. Moore, Mr. Moore, Mr. Betters, Ms. Gard, Mr. Reed, and Mrs. Williams;

- State law negligence claims against Sgt. Seye, Sgt. Ndaiye, Ms. Moore, Mr. Moore, Mr. Betters, Ms. Gard, Mr. Reed, Mrs. Hord, and Mrs. Williams;

- An Eighth Amendment excessive force claim against Sgt. Ndaiye; and

- A Rehabilitation Act claim against the Indiana Department of Correction.

These claims will be resolved through settlement or a jury trial. The Magistrate Judge is asked to hold a settlement conference.

**IT IS SO ORDERED.**

3/28/2023

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

DANNY R. RICHARDS
866216
INDIANA STATE PRISON
INDIANA STATE PRISON
Electronic Service Participant – Court Only

Douglass R. Bitner
Stoll Keenon Ogden PLLC
doug.bitner@skofirm.com

Stephanie Michelle Davis
Office of Attorney General Todd Rokita
stephanie.davis@atg.in.gov

Rachel D. Johnson
Stoll Keenon Ogden PLLC
rachel.johnson@skofirm.com

Joseph Thomas Lipps
BBFCS ATTORNEYS
jlipps@bbfcslaw.com

Eric C. McNamar
LEWIS WAGNER, LLP
emcnamar@lewiswagner.com

Julie Tront
Office of Indiana Attorney General
julie.tront@atg.in.gov

Magistrate Judge Kellie M. Barr